# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
| | : | |
| JACQUELINE EVERSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:05-CV-2459-RWS |
| | : | |
| LIBERTY MUTUAL | : | |
| ASSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Jacqueline Everson, proceeding *pro se*, initiated this action on

September 21, 2005, against Defendant Liberty Mutual Assurance Company

("Liberty").  In her original Complaint, Plaintiff alleged wrongful termination

of her disability benefits under the Employment Retirement Income Security

Act of 1974 ("ERISA"), see 29 U.S.C. § 1002(1), and several related claims

arising under state law.  (See Pl.'s Original Complaint [1-1] [hereinafter

"Compl."].)  In an Order dated October 10, this Court dismissed Plaintiff's state

law claims, leaving intact only Plaintiff's claim under ERISA.  (See Order of

October 10, 2006 [35] at 1-4.)  By Order dated November 2, 2006 [36], the Court denied both parties' motions for summary judgment.[1]

This case then came before the Court for trial on December 16, 2008. After considering the evidence presented at trial and the arguments of Ms. Everson and defense counsel, the Court enters the following Findings of Fact and Conclusions of Law.

## Findings of Fact

### I.     The Parties

1.     Plaintiff Jacqueline Everson is a 50-year-old female and a former employee of The Coca-Cola Company.

2.     Defendant Liberty Life Assurance Company of Boston ("Liberty"), sued as "Liberty Mutual Assurance Company," is a company which sells and administers group plans for long-term disability benefits.

### II.    The Policy

3.     At all times relevant to this action, Liberty was under a contract,

---

[1] The procedural posture of this case is fully reported in this Court's Order of October 10, 2006 and Order of November 2, 2006.

identified as Group Policy No. GF3-850-281390-01 (the "Plan"),

with Coca-Cola to provide group long-term disability income

insurance to Coca-Cola's covered employees within the meaning

of section 3(1) of the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1002(1). (Def. Ex. 1.) At all times

relevant to this action, Plaintiff was a covered employee.

4.     Under the Plan, "Disabled" is defined as a condition in which in

the first two years "the Covered Person, as a result of Injury or

Sickness, is unable to perform the Material and Substantial Duties

of his Own Occupation; and [two years] thereafter, the Covered

Person is unable to perform, with reasonable continuity, the

Material and Substantial Duties of Any Occupation." The parties

do not dispute that, because the Plaintiff's disability benefits were

terminated within two years after they were commenced, the

controlling provision in this case respects Plaintiff's ability to

perform the material duties of her "Own Occupation," and not

"Any Occupation."

5.    The Plan also defines "Injury" as "bodily impairment resulting

directly from an accident and independently of all other causes,"

and defines "Sickness" as "illness, disease, pregnancy or

complications of pregnancy."

6.    The Plan further provides that "Liberty shall possess the authority,

in its sole discretion, to construe the terms of this policy and to

determine benefit eligibility hereunder."

7.    The Plan also authorized Liberty to require medical examinations

or other evaluations as part of its review of a claim for benefits:

> Liberty, at its own expense, may have the right and
> opportunity to have a Covered Person, whose Injury
> or Sickness is the basis of a claim, examined or
> evaluated at reasonable intervals deemed necessary by
> Liberty.  This right may be used as often as
> reasonably required.

(Def. Ex. 1.)

## III.   Plaintiff's Occupation

8.    Plaintiff became employed by Coca-Cola in 1988 (See Def. Ex. 2,

p. 422.)  In 2003, her job title was Senior Financial Analyst,

described as a "desk job" with most of the day spent "working on a

4

computer, with some time in meetings and on the phone." (Id. at 339.)

9. Liberty received a Physical Job Evaluation Form from Coca-Cola describing Plaintiff's occupational duties. (See id. at 339.) In this report, the manager of Plaintiff's work-group stated that Plaintiff's occupational duties required seven to eight hours of sitting, zero to one hour of standing, four to six hours of reaching while working at a computer, repetitive movements on a keyboard, and four to six hours of fine finger dexterity. (Id.)

**IV.   Plaintiff's Claim and the Cessation of Benefits**

**A.   Plaintiff's Medical History Prior to Approval of Long-Term Disability Benefits**

10. In early 2003, Plaintiff began experiencing neck, arm, and elbow pain. (Def. Ex. 2, pp. 261-64.)

11. In May and June 2003, plaintiff was seen by Steven Stewart, M.D., a family practice physician, who diagnosed elbow strain. (Id. at 371-72.)

5

12.     On July 11, 2003, plaintiff was seen by Jon Hyman, M.D., an

orthopedic surgeon.  (<u>Id.</u> at 261-63.)  X-rays of plaintiff's elbow

were normal, and Dr. Hyman diagnosed lateral epicondylitis and

recommended rest and splinting for two weeks.  (<u>Id.</u> at 262.)

13.     On August 1, 2003, plaintiff reported increased elbow pain,

bilateral shoulder pain, and neck pain.  (<u>Id.</u> at 258-60.)  Dr. Hyman

diagnosed lateral epicondylitis of the elbow and a cervical strain.

He also noted that Plaintiff's overall condition was "getting

worse," and suggested that Plaintiff work with restrictions,

including limited heavy gripping, limited repetitive gripping,

twisting or squeezing, and limited rapid repetitive hand/wrist

movement.  (<u>Id.</u>)

14.     On August 11, 2003, plaintiff was seen by Anita Cone-Sullivan,

M.D., also an orthopedic surgeon, complaining of neck and upper

extremity pain, numbness, tingling, and right arm pain. (<u>Id.</u> at 255-

57.)

15.     Based on a physical examination and x-rays of plaintiff's cervical

spine, Dr. Sullivan diagnosed cervical radiculopathy, cervical

spondylosis, left carpal tunnel syndrome, and left lateral epicondylitis. (Id.)

16. On August 29, 2003, when plaintiff complained of neck and bilateral upper extremity pain, Dr. Sullivan recommended that she undergo an electromyogram and nerve conduction study (EMG/NCS) and a cervical MRI. (Id. at 252-54.)

17. After plaintiff "discussed not being able to attend work due to her . . . symptoms at this time," Dr. Sullivan placed her off work for two weeks. (Id.)

18. Plaintiff never returned to work for Coca-Cola after that office visit. (Id. at 344-73.)

19. On September 10, 2003, plaintiff had an MRI of the cervical spine, which was described as having "[t]echnically compromised axial gradient echo sequences due to patient motion artifact." (Id. at 359.) Nevertheless, the MRI was interpreted to show a herniated disc at C4-5 on the right, with mild flattening of the cord at that level and impingement of the right C5 nerve root, and an

AO 72A
(Rev.8/82)

osteophyte at the C5-6 level, impinging both C6 nerve roots.  (<u>Id.</u> at 359-60.)

20.   On September 11 and 18, 2003, plaintiff saw Dr. Sullivan, who diagnosed cervical radiculopathy, left elbow lateral epicondylitis, cervical spondylosis, but noted that the electromyogram and nerve conduction studies were normal.  (<u>Id.</u> at 250-51, 248-49.)  Dr. Sullivan reported that Plaintiff should remain on leave for two months, but "[a]nticipate[d] reassessing this in the future and possibly returning her to work at least with restrictions" prior to the end of the two-month period.  (<u>Id.</u> at 249.)  Dr. Sullivan also recommended a series of three epidural steroid injections and physical therapy.  (<u>Id.</u>)

21.   Plaintiff attended physical therapy for approximately four weeks, but discontinued it on the grounds that it exacerbated her symptoms.  (<u>Id.</u>)  Plaintiff did not obtain the epidural steroid injections.

22.   On October 3, 2003, Plaintiff saw Dr. Stewart, complaining of pain and numbness in her neck, arm, and shoulder.  (<u>Id.</u> at 355.)  Dr.

Stewart recommended that plaintiff see an orthopedist and get an MRI of her elbow.  (Id.)

23.     Plaintiff continued to see Dr. Stewart approximately once every two months until at least August 2004, although his office notes are largely illegible.  (Id. at 238-39, 308-09, 347, 349-50, 355-57.)

24.     On October 14, 2003, plaintiff had an MRI of the left elbow, which showed subtle abnormal signal stimulation to the common extensor tendon, and mild lateral epicondylitis.  (Id. at 356-57.)

25.     On November 6, 2003, plaintiff saw Howard Levy, M.D., of The Emory Spine Center, who diagnosed cervical radiculopathy, and recommended that plaintiff consult a surgeon.  (Id. at 291-92.)  Dr. Levy noted that plaintiff was scheduled for a surgical consult with John G. Heller, M.D., in January 2004 and that she should remain out of work until then.  (Id. at 351.)

26.     On January 20, 2004, plaintiff was seen by Dr. Heller, who noted that the MRI in September 2003 was of poor quality and that "[t]he best one can glean is that she has mild multilevel spondylosis in the cervical spine with a fairly spacious cervical spinal canal."  (Id.

AO 72A
(Rev.8/82)

at 285-87.)  Dr. Heller also noted that without specific, identifiable

compression of plaintiff's spinal cord or nerve root, he would

"have a hard time explaining this collection of symptoms and this

level of dysfunction based upon a cervical spine injury."  (Id.)

27.     Dr. Heller said that the MRI findings were not entirely consistent

with his findings on physical examination, and he recommended

that plaintiff undergo a cervical myelogram and CT scan to

determine whether there was any compression of her spinal cord.

(Id.)

**B.      Plaintiff's February 2004 Claim is Approved**

28.     On February 10, 2004, Plaintiff filed a claim for long-term

disability benefits with Liberty, stating that she had become

disabled due to problems with her back, neck, and upper

extremities; had been unable to work since August 29, 2003; and

had exhausted her short-term disability benefits.[2]

_____

[2] The Plaintiff's exhaustion of short-term disability benefits was a prerequisite to
her eligibility for long-term disability

29. In support of her claim, Plaintiff produced her medical records, including an Attending Physician Statement of Dr. Stewart, her treating physician, and the reports of the doctors described above. (Id. at 344-73, 423.) Plaintiff reported that she had "reocurring [sic] neck stiffness"" for which she was first treated on July 11, 2003. (Id. at 423.)

30. In the Attending Physician Statement, dated February 4, 2004, Dr. Stewart reported that plaintiff had been diagnosed with cervical spine radiculopathy and carpal tunnel syndrome. He opined that Plaintiff "will likely remain in pain for a prolonged period," but estimated that Plaintiff would be able to return to work within three to six months. (Id. at 345-46.)

31. In addition to Plaintiff's medical reports, Liberty received the Physical Job Evaluation Form from Coca-Cola describing Plaintiff's occupational duties as full-time sedentary work. (See id. at 339, 330-32.)

32. Liberty also requested a Physical Capacities report from Dr. Stewart, but had not yet received it at the time it made its decision

on Plaintiff's claim.

33.     On April 14, 2004, based on the above-described medical reports,

        Dr. Stewart's Attending Physician Statement, and the Physical Job

        Evaluation Form, Liberty approved Plaintiff's claim for disability

        benefits and retroactively applied her benefits to March 5, 2004,

        the day after her short-term benefits ended.  (Id. at 301.)

**C.   Liberty Reevaluates Plaintiff's File**

34.     On April 15, 2004, a day after Liberty granted Plaintiff's request

        for benefits, Dr. Stewart responded to Liberty's request by

        providing a Physical Capacities Form.  In the form, Dr. Stewart

        stated that, "[d]ue to patients severe chronic pain this patient is

        100% disabled."  (Id. at 298.)  Dr. Stewart also stated, however,

        that Plaintiff could sit for four hours with hourly breaks, stand for

        two hours with hourly breaks, walk for two hours with 30 minute

        breaks, and reach below shoulder level for one hour daily.  (Id.)

35.     On May 12, 2004, Liberty Life's medical consultant concluded

        that plaintiff's medical records supported her diagnosis of cervical

radiculopathy and that her medical care had been appropriate. (Id. at 281.)

36. In October 2004, Liberty reviewed Plaintiff's medical records to determine Plaintiff's continuing eligibility. Susan McCormack, a Liberty nurse, reviewed Plaintiff's file and noted that her medical records gave certain indications that her condition was improving and she was capable of some work. She also noted that it did not appear that Plaintiff had acted upon the recommendations of her doctors. Nurse McCormack observed, for example, that "[t]here is no evidence that [Plaintiff] had the CT myelogram as recommended by Dr. Heller, . . . no evidence any additional diagnostic testing was obtained[, and n]o evidence of epidural steroid [injection] or additional [physical therapy]." Ms. McCormack concluded that a "[p]otential for increased activity is present." (Id. at 20-21.)

37. On November 18, Plaintiff had an electromyographic/nerve conduction ("EMG/NC") study performed by Dr. Jacquelyn Washington. Based on the results of the test, Dr. Washington

concluded that Plaintiff had "severe" bilateral cervical radiculopathy. (Pl.'s Ex. 17.) In her report, Dr. Washington noted that the electromyography "was remarkable for evidence of spontaneous activity and chronic denervation/reinnervation noted in the left deltoid, biceps, and infraspinatus. (Id.) Spontaneous activity was seen in upper and middle cervical paraspinal muscles bilaterally." (Id.) While not opining on Plaintiff's capacity to work, Dr. Washington concluded that "[t]his is an abnormal study. . . . The findings are severe[,] and consistent with both ongoing active as well as chronic denervation. Diagnostic considerations include cervical spondylosis and multilevel disc disease." (Id.)

38.    On December 21, Dr. Washington again met with Plaintiff, and reported that "the patient continues to be symptomatic with evidence of upper motor neuron and lower motor neuron weakness." (Id. at 279.) Dr. Washington concluded, in a letter sent to Plaintiff's family physician, Dr. Stewart, that "[s]urgical consultation is likely to be required," but "[c]ontinue conservative management until then. . . ." (Id.)

14

**D. Independent Medical Examination and Termination of Benefits**

39.     In November 2004, Liberty requested that Plaintiff attend an

"independent medical evaluation" ("IME").  Plaintiff agreed, and

on December 13, 2004, Plaintiff was examined by Dr. Ralph

D'Auria, an orthopedic surgeon.  (Def. Ex. 2 at 205-11.)

40.     Dr. D'Auria spent approximately fifteen minutes examining

Plaintiff.  Dr. D'Auria also reviewed Plaintiff's medical records,

including the reports of Plaintiff's prior visitations to the doctors

discussed above, the results of the 9/10/03 cervical MRI scan, Dr.

Stewart's Physical Capacities Form, and the results of Dr.

Washington's EMG/NC study.  (Id. at 207-08.)

41.     In his report, Dr. D'Auria concluded that Plaintiff had "mild

cervical radiculopathy, which has been improving over time with

the procedures performed and the medical care that she has

received.  Based on the findings on the physical examination, the

radicolopathy is continuing to improve clinically; as indicated by

the reflexes, the appearance of the muscles, the muscular strength,

and other objective findings."  (Id. at 208.)  Dr. D'Auria further

15

noted that all of Plaintiff's specialists agreed that Plaintiff's condition was "nonsurgical," but that, because "[s]he has received all the necessary treatment for her condition, which has been performed by qualified physicians," there is no specific treatment that would enable Plaintiff to return to normal functioning. (Id.)

41. Dr. D'Auria also stated, however, that "claimant should be able to perform her job, which is sedentary in nature, with [restrictions on heavy lifting and overhead pushing and pulling]. Upon returning to work after being inactive for a long period of time, some degree of discomfort and initial mild pain should be expected. However . . . this should resolve with time." (Id.) He opined that, within 3 to 4 months, Plaintiff "should regain her normal strength and normal function," and thus the need for restrictions on her ability to work would eventually subside. (Id.)

42. In his report, Dr. D'Auria noted "a significant degree of embellishment of symptoms during the physical examination." Plaintiff "seemed to be more focused on the pain process than on trying to perform in a functional manner. She complained of pain

16

constantly during the examination, even upon light touch, and displayed exaggerated pain behavior throughout. This behavior is very typical of non-physiological overlay that is out of context with the objective findings." (<u>Id.</u> at 210.) He further noted that "[m]any of her limitations appear to be self-imposed due to a fear of performing any movements or any activity. This fear should be alleviated by returning to work in an environment where her attention is not concentrated on pain behavior, but rather on creative and productive activities." (<u>Id.</u> at 210.)

43.     In his report, Dr. D'Auria also noted that "[t]he total time spent interviewing and examining the claimant, as well as reviewing her medical records was approximately 2.5 to 3 hours." (<u>Id.</u> at 211.)

44.     On January 11, 2005, Liberty wrote to Dr. Stewart, asking whether he agreed with the findings of Dr. D'Auria, and, if he did not, to explain the reasons for his disagreement. The letter requested Dr. Stewart's response by February 1, and stated that, in the absence of a response, Liberty would presume that Dr. Stewart was in agreement with Dr. D'Auria. (<u>Id.</u> at 202-04.)

AO 72A
(Rev.8/82)

45.   On February 3, 2005, after not receiving a response from Dr.

Stewart, Liberty wrote to Plaintiff informing her of its decision to

terminate Plaintiff's disability benefits.  Liberty stated that it

concluded that Plaintiff was able to perform full-time sedentary

work based upon the opinion of Dr. D'Auria and the lack of

response from Dr. Stewart.  (Id. at 198-200.)

**E.   Appeal of Termination**

46.   On February 7, 2005, Plaintiff contacted Liberty and stated that she

wished to appeal Liberty's decision to terminate her benefits.  In a

faxed letter, Plaintiff suggested that it did not appear from Dr.

D'Auria's analysis that he had considered the results of the

EMG/NC study performed by Dr. Washington or the opinion of

Dr. Stewart.  Plaintiff included a letter from Dr. Stewart dated the

same day, which stated that Plaintiff was "permanently and totally

disabled due to chronic, severe, neuropathic pain from her cervical

spine." (Id. at 181; Pl. Ex. 8.)

47. Liberty forwarded the EMG/NC report and Dr. Stewart's letter to Dr. D'Auria and asked whether this information affected Dr. D'Auria's conclusions.

48. On February 11, 2005, Dr. D'Auria wrote to Liberty, stating that he had "concerns" about the EMG report because it contained no "graphs supporting the assertions issued in Dr. Washington's EMG report." (Id. at 171.)  Because such graphs "are usually recorded so that another electromyographer can review the raw data and issue any conclusions based upon objective evidence," and because Dr. D'Auria didn't have the benefit of that raw data, Dr. D'Auria was "unable to issue an opinion regarding the testing without these graphs." (Id.)

49. Dr. D'Auria further stated:  "Also, whereas I agree that the patient is somewhat disabled, the extent of the disability is still unknown. A functional capacity evaluation is needed as an objective way to accurately measure her functional abilities and disabilities, since embellishment and magnification of symptoms contaminate any potential positive findings on the physical examination." (Id.)

AO 72A
(Rev.8/82)

50. Dr. D'Auria concluded that "[his] initial impression remains unchanged," but recommended that "a functional capacity evaluation be performed in order to determine the patient's true degree of disability." (Id.)

51. On February 16, Liberty sent Dr. Stewart a letter requesting the raw data underlying Dr. Washington's EMG report. In the letter, Liberty stated that, "[d]ue to conflicting medical opinion regarding the interpretation of the study, please send a copy of all relevant raw data for our review, as we are unable to make a determination regarding further benefit eligibility until this is clarified." (Id. at 166.)

52. In a letter dated February 18, Liberty wrote to Plaintiff to let her know that Liberty had "reopened [Plaintiff's] claim until a final determination regarding [her] eligibility is determined, pending review of the raw data from the EMG/NCS results." (Id. at 165.) Plaintiff's benefits were then reinstated, and Plaintiff was sent a check for the period of February 4 through March 3, 2005.

AO 72A
(Rev.8/82)

53. On February 24, pursuant to Dr. D'Auria's recommendation, Liberty scheduled a functional capacity evaluation to take place and wrote Plaintiff to this effect.  (Id. at 161-62.)

54. On March 4, Plaintiff faxed Liberty a letter, indicating her refusal to participate in a functional capacity evaluation.  The letter stated as follows:

> Since the onset of my disability I have seen eight (8) physicians including; [sic] (7) Specialist, (1) Independent Medical Examination (IME) requested by Liberty on December 13, 2004, and several Company physicians (Hyman, Cone-Sullivan, Levy, and Heller.)
>
> During the IME you requested, my right to medical privacy was violated, and I was treated harshly.  While in my gown and barefoot, I was led to a waiting area with a tile floor.  The doors were opened wide on a day that was cold enough for a coat (12/13/2004).  My medical diagnosis and history was discussed in a waiting area where patients and other staff could hear.
>
> I have complied with all requirements necessary to determine my claim, and the severity of my disability.  Therefore, I decline to agree with you request for a second medical examination.

AO 72A
(Rev.8/82)

> Please do not schedule any additional
> testing/evaluations.  My only request is to be
> treated fair.

(Id. at 139.)

      55.   On March 7, Liberty responded to Plaintiff's March 4th letter,

stating that it would suspend Plaintiff's benefits based on its

original decision unless Plaintiff attended a functional capacity

evaluation.  (Id. at 155-56.)  Liberty's letter stated:

> At this time we are writing to advise you we
> will reschedule the FCE for you should you
> reconsider.  However, your benefit is suspended
> pending your attending a rescheduled FCE.  If
> you decide you will not attend a rescheduled
> FCE, then your claim will be closed based on
> the original IME results.
>
> We considered the [EMG] testing in the
> absence of the raw data from the EMG/NCS
> testing done by Dr. Washington, due to your
> doctor being in disagreement.  However, since
> your doctor will not provide us with the raw
> data for review, and you will not attend an FCE,
> then we will maintain our original decision
> based on the IME results from Dr. D'Auria.

(Id.)

AO 72A
(Rev.8/82)

56. At the close of the letter, Liberty reminded Plaintiff of the language in its disability policy requiring Plaintiff to be "examined or evaluated at reasonable intervals deemed necessary by Liberty. . . as often as reasonably required." (<u>Id.</u>)

57. Sometime thereafter, Dr. Stewart sent Liberty the raw data of the EMG performed by Dr. Washington.

58. On March 18, Dr. D'Auria reviewed the raw data of the EMG report and took issue with Dr. Washington's findings and the sufficiency of the report. (<u>Id.</u> at 124.) In an addendum to his original report, Dr. D'Auria requested further clarification of the "evidence of spontaneous [muscle] activity" by Dr. Washington, and noted that "the report does not indicate the basis for the findings of denervation/reinnervation." (<u>Id.</u>)

59. Dr. D'Auria further stated that, in the absence of this data, he was "not able to correlate the findings obtained on my physical examination with [the conclusions] of Dr. Washington . . . especially with no details regarding the actual findings; no descriptions of the behavior of the muscles under voluntary

AO 72A
(Rev.8/82)

contraction, minimal contraction, and maximum contraction; and no indication of the type of spontaneous activity." (Id.)

60. Therefore, he concluded that his "original recommendations remain unchanged [because this] additional evidence does not support an inability of Ms. Everson to perform full time sedentary activities." (Id.)

61. After receiving this report, Liberty wrote to Dr. Washington on March 23 in an attempt to clarify the basis for her findings. In the letter, Liberty repeated the requests of Dr. D'Auria for details as to the specific muscle activity that Dr. Washington found.

62. Thereafter, Dr. Washington returned Liberty's letter, and in a handwritten note in the margin, stated: "description of muscles is on the original report." (Id. at 123.) On March 25, Dr. D'Auria completed another report in which he concluded that Dr. Washington's note "does not provide any additional medical information . . . [and] does not support the inability of the claimant to perform full time sedentary duties." (Id. at 119.)

AO 72A
(Rev.8/82)

63.    On March 29, Liberty wrote to Plaintiff, stating that it had decided

to uphold its original decision suspending Plaintiff's benefits and

advising her of her right to appeal.  (Id. at 109.)

64.    On April 1, Plaintiff phoned Liberty to request an appeal.  (Id. at

97.)  Liberty rejected her appeal on April 8, 2005, but stated that it

would retroactively extend her benefits through March 28, 2005,

the date when Liberty appeared to make its final decision regarding

Plaintiff's eligibility.[3]

**F.  Conflict of Interest**

65.    In the present case, the parties agree that Liberty, at the time it

terminated Plaintiff's benefits, was both vested with discretion

---

[3] Liberty also notified Plaintiff that she had exhausted her administrative remedies. Approximately 4 months later, on July 25, 2005, Dr. Stewart again wrote to Liberty, stating that Plaintiff's "condition has progressively deteriorated since 2003 to the point where she has been rendered totally disabled . . . . Due to the severity of her condition I have not released Mrs. Everson to return to work since her disability onset in 2003." (Pl.'s Ex. B to Mot. for Summ. J. [15-3] at 331.)  Dr. Stewart also attached the reports of Dr. David Gower and Dr. Jacqueline Washington.  However, because these reports were sent after Plaintiff had exhausted her appeal with Liberty, they were not part of the administrative record considered by Liberty in evaluating her eligibility, and thus should not be considered by this Court.  See Parness v. Metro. Life Ins. Co., 291 F. Supp. 2d 1347, 1356-57 (S.D. Fla. 2003).

under the plan and suffered from a conflict-of-interest because it paid benefits out of its own funds.

66. Liberty's employees who make decisions regarding the claims of ERISA plan participants are paid fixed salaries not based upon the number of claims paid or denied. (Testimony of Charles Johnson.)

67. Liberty does not establish numerical guidelines or quotas regarding claim payments or denials. (Id.)

68. Liberty does not act in a manner to overtly discourage the payment of claims and employs the same procedures for claims that it administers regardless of whether it is paying claims out of its own funds or the funds of another party. (Id.)

69. Plaintiff introduced no evidence outside of the administrative record, such as historical data concerning Liberty's claims denial rate, that would be relevant in determining the weight of the conflict of interest.

## Conclusions of Law

I. **ERISA Framework**

1. Plaintiff's claims arise under section 502 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

2.    In the present case, the parties agree and the Court finds that Liberty, at the time it terminated Plaintiff's benefits, was both vested with discretion under the plan and suffered from a conflict-of-interest.

3.    ERISA is silent regarding the standard of review applicable to an administrator's benefits determination.  However, the Eleventh Circuit has recently clarified that an arbitrary-and-capricious standard applies to a challenge of a decision to deny benefits where the claims administrator is vested with discretion.  See Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008).

4.    The Eleventh Circuit also clarified that the burden of proof remains at all times with the plaintiff, and the existence of a conflict of interest should merely be considered a factor in the determination of arbitrariness and capriciousness.  Id.  In Doyle, the court explained as follows:

> We continue to adhere to [the principle] that reviewing courts must consider an administrator's conflict of interest in deciding whether the decision to deny benefits was arbitrary. But we hold that [Metropolitan Life Ins. v. Glenn, 128 S. Ct. 2343 (2008)] implicitly overrules our precedent to the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard. We hold that the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious. And we hold that, while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.

Id. at 1360.

5.      As a result of the Supreme Court's decision in Glenn and the

Eleventh Circuit Court of Appeals' decision in Doyle, this Court's

sole inquiry is whether Plaintiff has demonstrated by a

preponderance of the evidence that Defendant's decision to deny

benefits was arbitrary and capricious.

6.      "[A]n abuse of discretion or arbitrary and capricious standard

means that the reviewing court will affirm merely if the

28

administrator's decision is reasonable given the available evidence, even though the reviewing court might not have made the same decision if it had been the original decision-maker.'" Callough v. E.I. du Pont de Nemours & Co., 941 F. Supp. 1223, 1228 n.3 (N.D. Ga. 1996); see also Carr v. The Gates Health Plan, 195 F.3d 292, 294 (7th Cir. 1999) ("Under the arbitrary and capricious standard, it is not [the Court's] function to decide whether [it] would reach the same conclusion as the Plan or even rely on the same authority.").  As a result, this Court is "limited to determining whether [Liberty Life's decision] was made rationally and in good faith – not whether it was right.'" Griffis v. Delta Family-Care Disability, 723 F.2d 822, 825 (11th Cir. 1984).

7.  The Court's review of the merits of the administrator's decision is limited to the administrative record.  Parness v. Metro. Life Ins. Co., 291 F. Supp. 2d 1347, 1356-57 (S.D. Fla. 2003).

## II.  Resolution of Plaintiff's Claim

8.  After full review and consideration of all the evidence in the administrative record, the Court concludes that Plaintiff has not

demonstrated by a preponderance of the evidence that Liberty's discretionary decision to deny benefits was arbitrary and capricious. Although this Court would not have arrived at the same decision as Liberty, several reasons convince this Court that Liberty's decision that Plaintiff was not "disabled" from performing full-time sedentary work was not unreasonable.

9. First, the independent medical evaluation of orthopaedic surgeon Dr. D'Auria, which was based upon a personal visit with Plaintiff and a full review of Plaintiff's medical records, concluded that, at the time the benefits decision was made, Plaintiff was capable of performing full-time sedentary work. The report also observed that Plaintiff may have been embellishing the level of her pain. Although the report's characterization of Plaintiff's injury as "mild" is in conflict with the observations of Dr. Washington and Dr. Stewart, its conclusion is based upon a complete medical analysis of Plaintiff's physical capabilities and pain tolerance. The Court cannot say that it was unreasonable for Liberty to have placed weight on the medical opinion of Dr. D'Auria, a board-

AO 72A
(Rev.8/82)

certified orthopaedic surgeon, in reaching its conclusion that Plaintiff was not "disabled" under the terms of the Plan.

10.     Second, Dr. Heller's observations in January 2004 lend support to both Dr. D'Auria's evaluation and Liberty's conclusion that Plaintiff was not "disabled." In his report, Dr. Heller noted that he encountered difficulty in analyzing Plaintiff's condition because "variable effort was manifested grading the motor groups in the upper extremities." (Def's Ex. 2, p. 286.) He also questioned the physical evidence of Plaintiff's pain, noting that "absent, [sic] specific, identifiable compression of either her spinal cord or nerve root, I would have a hard time explaining this collection of symptoms and this level of dysfunction based upon a cervical spine injury." (Id.) Dr. Heller's observation of Plaintiff's variable effort and the zeal with which she described her pain is consistent with Dr. D'Auria's observations; it also gives reason for a claims administrator to believe that the severity of Plaintiff's pain and inability to work was being overstated.

AO 72A
(Rev.8/82)

11.     Third, Plaintiff refused to attend the functional capacity evaluation

requested by Liberty.  Plaintiff was obligated under the Plan to

provide proof of continuing disability and to honor Liberty's

requests to be independently evaluated by other physicians.

Compare Doyle, 542 F.3d at 1352 ("The burden fell on Doyle to

establish that she was entitled to LTD benefits.").  In this regard,

the Plan provided that Liberty could terminate benefits on "the date

the Covered Person refuses to be examined or evaluated at

reasonable intervals."  Although Plaintiff provided as the reason

for her refusal the degrading experience of attending the IME with

Dr. D'Auria, it was not unreasonable for Liberty to request such an

evaluation and to consider Plaintiff's refusal to attend the

functional capacity evaluation in denying her disability benefits.

Dr. D'Auria recommended that Plaintiff attend such an evaluation.

Moreover, the conflicting medical opinions of Dr. Stewart and Dr.

D'Auria and the limited data concerning Plaintiff's functional

capacity provided good reason for Liberty to make such a request.

In view of Plaintiff's obligation under the Plan, and in view of the

conflicting medical evidence, Plaintiff's refusal to participate in

the functional capacity evaluation provides further evidence that

Liberty's termination of Plaintiff's benefits was not unreasonable.

Cf. Porter v. Provident Life and Accident Ins. Co., 2006 WL

249541 (11th Cir. Feb. 2, 2006) (unpublished) (holding that

plaintiff's failure to attend independent medical evaluation as

required in disability plan constituted an independent ground for

termination of plaintiff's benefits and thus summary judgment in

favor of defendant was proper).[4]

---

[4] Notably, Liberty does not argue that Plaintiff's refusal to attend a functional capacity evaluation *alone* constituted an independent basis to terminate Plaintiff's benefits. See Porter, 2006 WL 249541 at *1. In Porter, the Eleventh Circuit held that a benefits provider had an adequate and independent justification to terminate the plaintiff's disability benefits based on the plaintiff's refusal to submit to an independent medical evaluation. Id. There, the insurer's original decision was based on disputed medical opinions regarding the plaintiff's condition. However, on the plaintiff's sixth appeal of the provider's decision, the provider offered the plaintiff the opportunity to submit to an independent medical evaluation. After the plaintiff refused, the provider denied her appeal, "reasoning that her failure to submit to an independent medical evaluation was a failure to comply with her obligations under the long term plan and establishes a new justification for disability benefits." Id.

Here, like in Porter, Liberty offered Plaintiff an opportunity to participate in an independent evaluation and pointed out in its March 7th letter to Plaintiff that Plaintiff had an obligation to reasonably participate in such evaluations at Liberty's request. (Def.'s Ex. 2, pp. 155-56.) Liberty's letter also provided, however, that should Plaintiff choose not to attend a functional capacity evaluation, "your claim will be closed based on the original IME results." (Id.) After noting the disagreement between Drs. Stewart

12.     Fourth, although Plaintiff relies heavily on the conclusion of her

family doctor, Dr. Stewart, that she was "disabled" under the

meaning of the Plan, the record does not make clear the medical

basis for Dr. Stewart's evaluation or the course of treatment

pursued by Dr. Stewart.  Rather, it appears that in addition to his

own evaluations, Dr. Stewart relied upon the subjective reports of

pain by Plaintiff and the medical reports of the specialists Plaintiff

───────────────────────

and D'Auria and the need for an independent evaluation, Liberty repeated that it would "maintain [its] original decision based on the IME results from Dr. D'Auria" if Plaintiff refused to submit to the functional capacity evaluation. (Id.)

Because of the specific language of Liberty's letter, this case is arguably distinguishable from Porter. Here, Liberty did not offer Plaintiff's refusal to comply with its request for an independent evaluation as an independent justification for its initial termination of benefits or in its decision on appeal.  Indeed, Liberty did not state in its letter of March 7 or any time afterwards that Plaintiff's refusal to participate was the reason (or one of the reasons) underlying Liberty's decision to terminate.  Rather, Liberty indicated to Plaintiff that it would "maintain" the reasoning of its "original decision based on the IME results from Dr. D'Auria" should Plaintiff refuse to participate in the functional capacity evaluation. (Id.)

Nonetheless, because Liberty has not raised this issue as an independent basis for termination of Plaintiff's benefits, and because the Court finds that this evidence provides limited value in determining the reliability of the evidence upon which Liberty relied in making its decision, this Court need not decide the difficult issue of whether an insurance provider can offer what appears in this case to be a *post hoc* independent justification for termination based on a insured's refusal to submit to an independent examination.  See Grayer v. Liberty Life Assur. Co. of Boston, 144 Fed. App'x 760, 761 n.1 (11th Cir. 2005) (declining to address similar issue and stating that "we do not decide whether district courts are limited to determining whether the reasons proffered by an ERISA plan administrator are the only reasons district courts can consider on appeal").

34

visited in formulating his own opinion of the nature of Plaintiff's disability. But notably, no other specialist opined as did Dr. Stewart that Plaintiff was totally and permanently disabled. In light of the absence of affirmative opinions by other doctors as to Plaintiff's continuing inability to work on a full-time sedentary basis, and in light of the fact that Dr. D'Auria is a board-certified orthopaedic surgeon with more specialized training than Dr. Stewart, Plaintiff's family medicine doctor, the Court cannot say that Liberty's decision to afford Dr. D'Auria's opinion more weight than Dr. Stewart's opinion was unreasonable. <u>See</u> <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 825 & 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) (stating that "plan administrators are not obliged to accord special deference to the opinions of treating physicians," and that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation").

AO 72A
(Rev.8/82)

13. Fifth, despite the recommendation of Dr. Sullivan to obtain steroid injections and the recommendation of Dr. Heller to obtain a CT scan, it does not appear that Plaintiff pursued these avenues of diagnosis and treatment. Nor did Plaintiff ever attempt to return to work after she started receiving temporary benefits beginning in August of 2003. These are additional facts which Liberty may have reasonably considered in its benefits determination. <u>Tippitt v. Reliance Standard Life Ins. Co.</u>, 276 F. App'x 912, at *3 (11th Cir. Apr. 29, 2008) (noting that it can be appropriate to consider *post hoc* explanations offered by the insurer about why claim was denied).

14. Finally, Liberty's repeated efforts to obtain more information from Plaintiff's diagnosing physicians after Plaintiff appealed its benefits decision demonstrates that Liberty "took steps to promote accurate claim assessment," and tends to discount the effect of the conflict of interest of which the Court must take account in this action. <u>See Doyle</u>, 542 F.3d at 1362 (suggesting that conflict of interest is of "little significance" where administrator shows that it

AO 72A
(Rev.8/82)

has endeavored to promote accurate claims determination).

Moreover, Liberty's decision to reinstate Plaintiff's benefits on multiple occasions during the pendency of her administrative appeal—which ultimately compensated Plaintiff for 13 of 24 months of her "own occupation" disability benefit until the final resolution of her appeal—weighs against finding that Liberty acted arbitrarily and capriciously in its decision.  Id.

15.    Plaintiff contends, citing Glenn, that Liberty failed to weigh the effect of the Social Security Administration's decision to award her disability payments.  At trial, Plaintiff stated during oral argument that the Social Security Administration awarded her such payments in 2005 and retroactively compensated her for her disability in the years 2003 and 2004.  However, unlike in Glenn, no evidence of the Social Security Administration's decision was included within the administrative record in this case because Plaintiff had already exhausted her administrative remedies prior to

AO 72A
(Rev.8/82)

the Social Security Administration's decision.[5]  Accordingly, it
was not unreasonable for Liberty to fail to reconcile the
determination of the Social Security Administration with its own
determination because, at the time the Social Security
Administration's determination was made, the administrative
process had been closed.   See Parness, 291 F. Supp. 2d at 1356-57
(review of benefits decision is limited to evidence present before
the administrator at the time of the decision).

16.   Plaintiff also contends that Liberty failed to weigh the opinions of
its own medical record examiners which led it to initially approve
her disability claim in April 2004.  Two examiners concluded that
plaintiff's medical records supported her diagnosis of cervical
radiculopathy and that her medical care and disability award had
been appropriate.  However, it was not unreasonable for Liberty to
reexamine the basis for its original decision to deny benefits and to
afford more weight to the opinions of the doctors who examined

---

[5]Although it is perhaps beside the point, the Court also notes that no evidence of
the Social Security Administration's award was introduced at trial.

38

Plaintiff than its own consultants who examined only Plaintiff's

records. As was the case in <u>Doyle</u>, the Plan in this case "permits

Liberty Life to terminate benefits unless the plan participant proves

that she satisfies the [disability] definition. Liberty Life had no

obligation to explain . . . how [Plaintiff's] condition had changed"

from the time it had decided to award benefits to the time it

decided to terminate benefits. <u>Doyle</u>, 542, F.3d at 1362. Rather,

"[t]he burden fell on [Plaintiff] to establish that she was entitled to

LTD benefits." <u>Id.</u>

17. Plaintiff also contends that the conflict of interest that Liberty

suffers combined with the  medical evidence which supports a

finding of disability in this case entitles her to judgment. As

discussed above, the Court is obligated to consider Liberty's

conflict of interest as a factor in determining whether Liberty acted

arbitrarily and capriciously in denying Plaintiff disability benefits.

<u>Glenn</u>, 128 S. Ct. 2343; <u>Doyle</u>, 542 F.3d at 1360. Although

considering Liberty's conflict of interest in the context of the

substantial medical evidence of Plaintiff's disability renders this a

close case, Plaintiff has not offered any additional evidence besides the mere existence of the conflict that would indicate that Liberty's conflict of interest undermined its ability to fairly discharge its duties under the Plan. For example, "[t]here is no evidence showing that Liberty Life was influenced by the conflict," such as "'a history of biased claims administration.'" <u>Doyle</u>, 542, F.3d at 1363 (quoting <u>Glenn</u>, 128 S. Ct. 2351). To the contrary, Liberty's repeated efforts to investigate Plaintiff's claim and decision to reinstate Plaintiff's benefits during the course of her appeal mitigates the effect of the conflict of interest in the Court's consideration. <u>Id.</u> (stating that absent evidence that the conflict of interest adversely affected the administrator's decision, "the conflict should have [] little weight in the district court's analysis"). In short, in the context of all of the evidence in this case, the Court cannot conclude that the conflict of interest tips the scale in favor of finding that Liberty's decision to deny benefits was arbitrary and capricious.

40

17. In sum, based upon (1) the opinion of Dr. D'Auria that Plaintiff was not disabled and had embellished her symptoms; (2) the report of Dr. Heller that he could not form an opinion as a result of Plaintiff's embellishment of systems; (3) Plaintiff's refusal to attend a functional capacity evaluation at the request of Liberty; (4) the apparent absence of any affirmative course of treatment or medical corroboration of Dr. Stewart's opinion concerning Plaintiff's disability; (5) Plaintiff's apparent failure to follow certain treatment recommendations of the specialists she visited; and (6) Liberty's conduct during the course of Plaintiff's appeal including thorough investigation and voluntary reinstatement of Plaintiff's benefits until the final resolution of her appeal, the Court concludes that Liberty's decision to terminate Plaintiff's benefits was not arbitrary and capricious.

18. Accordingly, Liberty is entitled to judgment in this action.

### Conclusion

Based on the foregoing, the Court finds in favor of Defendant and against Plaintiff in this action. The Clerk is **DIRECTED** to **ENTER JUDGMENT** in

41

favor of Defendant and against Plaintiff.

**SO ORDERED** this  2nd  day of January, 2009.

_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)